**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-3320
_____

MARK S. WALLACH, as Chapter 7 Trustee for the
Bankruptcy Estate of Performance Transportation Services
Inc., on behalf of the estate and all others similarly situated;
TAURO BROTHERS TRUCKING COMPANY;
TOLEDO MACK SALES & SERVICE INC.; JJRS LLC,
                                                              Appellants
v.

EATON CORPORATION; DAIMLER TRUCKS NORTH
AMERICA LLC; FREIGHTLINER LLC; NAVISTAR
INTERNATIONAL CORPORATION; INTERNATIONAL
TRUCK AND ENGINE CORPORATION; PACCAR INC.;
KENWORTH TRUCK COMPANY; PETERBILT MOTORS
COMPANY; VOLVO TRUCK NORTH AMERICA;
MACK TRUCKS INC.; NAVISTAR, INC.
_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 1-10-cv-00260)
District Judge: Honorable Sue L. Robinson
_____

Argued: June 7, 2016

Before: CHAGARES, KRAUSE, and SCIRICA, *Circuit Judges*

(Opinion filed: September 14, 2016)
_____

Glen DeValerio, Esq.
Berman DeValerio
One Liberty Square
Boston, MA 02109

Kyle G. DeValerio, Esq.
Marc J. Greenspon, Esq.
Berman DeValerio
3507 Kyoto Gardens Drive
Suite 200
Palm Beach Gardens, FL 33410

Manuel J. Dominguez, Esq.
Cohen Milstein
2925 PGA Boulevard
Suite 200
Palm Beach Gardens, FL 33410

Richard A. Koffman, Esq.
Emmy L. Levens, Esq. (Argued)
Daniel H. Silverman, Esq.
Cohen Milstein
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, DC 20005

2

Jessica Zeldin, Esq.
Rosenthal Monhait & Goddess
919 North Market Street
Suite 1401
Wilmington, DE 19801

*Counsel for Appellants*

Erik T. Koons, Esq.
Joseph A. Ostoyich, Esq.
Baker Botts
1299 Pennsylvania Avenue, N.W.
The Warner
Washington, DC 20004

Donald E. Reid, Esq.
Morris Nichols Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899

Benjamin F. Holt, Esq.
John R. Robertson, Esq.
Hogan Lovells
555 Thirteenth Street, N.W.
Columbia Square
Washington, DC 20004

John A. Sensing, Esq.
Potter Anderson & Corroon

1313 North Market Street
6th Floor
Wilmington, DE 19801

Corey W. Roush, Esq.
Pratik A. Shah, Esq. (Argued)
James E. Tysse, Esq.
Akin Gump Strauss Hauer & Feld
1333 New Hampshire Avenue, N.W.
Suite 400
Washington, DC 20036


Brian P. Borchard, Esq.
Daniel E. Laytin, Esq.
James H. Mutchnik, Esq.
Kirkland & Ellis
300 North LaSalle Street
Suite 2400
Chicago, IL 60654

Kelly E. Farnan, Esq.
Richards Layton & Finger
920 North King Street
One Rodney Square
Wilmington, DE 19801

Thomas L. Boeder, Esq.
Cori G. Moore, Esq.
Perkins Coie
1201 Third Avenue
Suite 4900
Seattle, WA 98101

Jeffrey B. Bove, Esq.
RatnerPrestia
1007 Orange Street
Suite 205
Wilmington, DE 19801

Catherine S. Simonsen, Esq.
Perkins Coie
1888 Century Park East
Suite 1700
Los Angeles, CA 90067

Eric J. Weiss, Esq.
1066 Clifton Avenue
Clifton, NJ 07013

Daniel J. Boland, Esq.
Michael J. Hartman, Esq.
Jeremy D. Heep, Esq.
Pepper Hamilton
18th & Arch Streets
3000 Two Logan Square
Philadelphia, PA 19103


M. Duncan Grant, Esq.
Pepper Hamilton
1313 Market Street
Suite 5100, P.O. Box 1709
Wilmington, DE 19899

*Counsel for Appellees*

_____

OPINION OF THE COURT
_____

KRAUSE, *Circuit Judge*.

In this case, we are called upon to determine, among other things, the fount and contours of federal common law applicable to the assignment of federal antitrust claims and the reach of the presumption of timeliness for motions to intervene as representatives of a class. Consistent with the Restatement of Contracts and the doctrines undergirding federal antitrust law, we hold that an assignment of a federal antitrust claim need not be supported by bargained-for consideration in order to confer direct purchaser standing on an indirect purchaser; such assignment need only be express, and that requirement was met here. We also hold that the presumption of timeliness, that is, the presumption that a motion to intervene by a proposed class representative is timely if filed before the class opt-out date, applies not only after the class is certified, as we held in *In re Community Bank of Northern Virginia*, 418 F.3d 277, 314 (3d Cir. 2005), but also in in the pre-certification context. Because the District Court failed to apply that presumption and the intervenors' motion here was timely considering the totality of the circumstances, we conclude the District Court abused its discretion in denying their motion to intervene on that basis. Accordingly, we will reverse and remand for proceedings consistent with this opinion.

6

## I. Background

Appellants seek to certify and represent a class of Class 8 truck purchasers to challenge an alleged conspiracy to monopolize among their immediate suppliers and those further up the market chain.[1] The relevant market can be envisioned as a three-layer cake, with parts manufacturers at the top, Original Equipment Manufacturers (OEMs) in the middle, and Class 8 truck consumers at the base. Parts manufacturers are companies that make component parts of trucks, such as the transmissions at issue in this case. These companies sell their products to OEMs, which, in turn, take orders from the customers to build trucks customized to the customers' needs. OEMs offer what are called "data books," which list the various options for each part; the customer chooses among the parts and options; and the OEM sources the parts from the manufacturers and uses them to build the truck then sold to that consumer.

Eaton Corporation—a parts manufacturer—has long been a near monopolist in the market for supplying Class 8 truck transmissions. In 1989, a company called ZF Meritor[2] emerged as a competitor, offering transmissions that truck customers could select from the OEMs' data books.

[1] This same alleged conspiracy was the subject of our opinion in *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012), where we explained the relevant market in detail. As that background is elsewhere available, we provide here a more limited overview.

[2] ZF Meritor began as simply "Meritor" in 1989, not becoming "ZF Meritor" until a merger in 1999.

According to Appellants, Eaton sought to sideline ZF Meritor and retain its hold on the market by conspiring with the OEMs to oust ZF Meritor from the market. It purportedly did so by entering Long Term Agreements with the OEMs that would offer increasingly large rebates on Eaton transmissions based on the percentage of transmissions a given OEM purchased from Eaton as opposed to ZF Meritor. The OEMs allegedly embraced this plan because, while they would benefit directly from rebates, they could pass on any increase in the price of Eaton's transmissions to their customers downstream, reaping extra profits without suffering detriment from monopoly-level prices. Per Appellants, the Long Term Agreements had their intended effect, ultimately forcing ZF Meritor to shutter in 2003 and giving Eaton an iron grip on the market for Class 8 truck transmissions.

But not without repercussions. In 2006, ZF Meritor sued Eaton for antitrust violations and won. *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012) (affirming the jury's verdict against Eaton). Separately, a group of indirect purchasers (i.e., customers who bought trucks from OEMs' immediate customers) brought a class action against Eaton; that case was dismissed after the district court undertook a full class certification analysis pursuant to Federal Rule of Civil Procedure 23, though an appeal is pending. *See generally In re Class 8 Transmission Indirect Purchaser Antitrust Litig.*, 140 F. Supp. 3d 339 (D. Del. 2015). And we now confront on appeal the suit brought on behalf of the OEMs' customers—i.e., "direct purchasers" of the Class 8 trucks—against both the OEMs and Eaton for damages arising from the alleged monopolization

8

conspiracy.[3] *Wallach v. Eaton Corp.*, 125 F. Supp. 3d 487, 492 (D.N.J. 2015).

---

[3] Specifically, Appellants brought a monopolization claim against Eaton under § 2 of the Sherman Act, 15 U.S.C. § 2, and three claims against both Eaton and the OEMs: a conspiracy to monopolize claim, *id.*, and two claims for entering exclusionary contracts, 15 U.S.C. §§ 1, 14. Importantly, Appellants may still be characterized as "direct purchasers" in relation to Eaton for purposes of this suit, even though the OEMs exist as middlemen between Eaton and Appellants. In 2010, Appellees filed motions to dismiss the case under Federal Rule of Civil Procedure 12(b)(6) in part for lack of statutory standing, arguing that because the putative class representatives (then Wallach and Tauro) did not *directly* purchase trucks from Eaton, they lacked standing under the so-called "direct purchaser rule." *See Ill. Brick Co. v. Illinois*, 431 U.S. 720 (1977) (allowing antitrust suits for damages only by plaintiffs who *directly* purchased items from the alleged violator). The District Court rejected this argument, determining that Appellants had statutory standing to sue under the limited co-conspirator exception to the direct purchaser rule, which allows an entity to sue its supplier *and* its supplier's supplier if (1) it sues both at once, and (2) the immediate supplier (i.e., the middleman) was so wrapped up in the conspiracy that it would be barred from seeking antitrust relief against the top-level supplier in a suit of its own. *Wallach v. Eaton Corp.*, 814 F. Supp. 2d 428 (D.N.J. 2011); *see also Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 258-60 (3d Cir. 2010); *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 378-84

Appellants here fall into two categories, each of which presents a different issue on appeal: those that brought suit as putative class representatives and those seeking to intervene to serve in that role. In the first group, the relevant party for purposes of appeal is Tauro Brothers Trucking Company ("Tauro"), the putative class representative that the District Court determined lacked standing.[4] Tauro never *directly* purchased a Class 8 truck from the OEMs, but rather purchased trucks from R&R—a company that was a direct customer of the OEMs and that expressly assigned Tauro its direct purchaser antitrust claims stemming from the alleged conspiracy between the OEMs and Eaton.[5] Before the District Court, Appellees challenged the propriety and effect of this assignment, urging that it is invalid for lack of bargained-for consideration and that Tauro lacks standing to

---

(3d Cir. 2005). Appellees do not challenge this ruling on appeal.

[4] Performance Transportation Services, Inc. (PTS), a direct customer of the OEMs and a former putative class representative in this case, is in bankruptcy and is represented by Mark Wallach as its Chapter 7 Trustee. While this case bears Wallach's name, PTS no longer seeks to represent the putative class and was dropped as a litigant in the case when the putative class redefined itself in briefing before the District Court.

[5] It is beyond dispute that a *validly* assigned antitrust claim can give direct purchaser standing to an indirect purchaser. *See, e.g.*, *In re Fine Paper Litig. State of Wash.*, 632 F.2d 1081, 1090 (3d Cir. 1980).

10

bring this suit or serve as a class representative. The District Court agreed and dismissed Tauro from the suit.

In the second group are Toledo Mack Sales and Service, Inc. and JJRS, LLC, both of which directly purchased trucks from the OEMs. Concerned after Appellees sought to dismiss Tauro for lack of standing that Tauro could be dropped from the suit, thereby leaving no named representative, Toledo Mack and JJRS filed motions under Federal Rule of Civil Procedure 24 to intervene as putative class representatives.[6] The District Court denied those motions, holding that neither entity had moved to intervene in a timely manner.

Having ejected the named plaintiff on standing grounds and foreclosed intervention by Toledo Mack and JJRS, the District Court dismissed the case in its entirety on August 31, 2015, concluding that the motion for class certification must be denied for want of a case or controversy necessary to sustain federal jurisdiction under Article III of the United States Constitution. On appeal, Appellants argue that (1) consideration is not required for a valid assignment of antitrust claims, and (2) the District Court abused its discretion in denying Toledo Mack and JJRS's motions to intervene. For the reasons that follow, we agree with these

---

[6] Toledo Mack and JJRS's motions to intervene were brought as "of [r]ight," Fed. R. Civ. P. 24(a), and, in the alternative, "[p]ermissive[ly]," Fed. R. Civ. P. 24(b).

11

arguments and conclude that the case should be remanded for further proceedings consistent with this opinion.[7]

## II.  Standards of Review[8]

We first review the District Court's decision that Tauro lacked standing[9] *de novo*, with deference to its factual

---

[7]  Appellants argue, in the alternative, that if consideration is required, R&R's assignment was supported by such consideration.  Because we conclude consideration is not required, we do not reach this alternative argument and do not opine on the District Court's disposition of it.

[8] The District Court had jurisdiction over Appellants' antitrust claims pursuant to 15 U.S.C. §§ 4 and 15(a) and 28 U.S.C. §§ 1331 and 1337.  We have jurisdiction under 28 U.S.C. § 1291 to review the District Court's conclusions.

[9] The standing inquiry in this case centers on the validity of R&R's assignment of its antitrust claim to Tauro. The District Court effectively entertained a 12(b)(1) motion on this question and treated it as a question of Article III standing.  But because the assignment is relevant to whether Appellants satisfy the direct purchaser rule, its validity is a question of statutory standing, not Article III standing. *Hartig Drug Co. v. Senju Pharm. Co.*, --- F.3d ---, No. 15-3289, 2016 WL 4651381, at *5-6 (3d Cir. Sept. 7, 2016). Unlike Article III standing, statutory standing is inherently non-jurisdictional, and—contrary to Appellants' assessment at oral argument, Oral Arg. Tr. 18—challenges to it should be brought by way of a 12(b)(6) motion, a summary judgment motion, or arguments on the merits—not by way of a 12(b)(1)

findings unless clearly erroneous. *White-Squire v. U.S. Postal Serv.*, 592 F.3d 453, 456 (3d Cir. 2010). We review the District Court's denial of Toledo Mack and JJRS's Rule 24 motions as untimely for abuse of discretion, *Halderman v. Pennhurst State Sch. & Hosp.*, 612 F.2d 131, 134 (3d Cir. 1979), which occurs where a "district court's decision rests

---

motion. *See id.* at \*4; *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 n.4 (2014).

We also disagree with the parties' suggestion at oral argument that we can infer the District Court addressed the validity of the assignment as a matter of statutory standing, rather than Article III standing. Oral Arg. Tr. 18, 36. Such an inference is not plausible. The District Court recited and employed the doctrinal standard applicable to questions of subject matter jurisdiction, foreclosing the possibility that it was treating the issue as a non-jurisdictional question of statutory standing. *Wallach v. Eaton Corp.*, 125 F. Supp. 3d 487, 491-92 (D.N.J. 2015). Moreover, because Appellees brought a 12(b)(6) motion in 2011, *see Wallach*, 814 F. Supp. 2d at 432, they were prohibited under Federal Rule of Civil Procedure 12(g)(2) from bringing their current challenge to Tauro's statutory standing as a 12(b)(6) motion in 2014, *accord Leyse*, 804 F.3d at 320-21. Despite the District Court's procedural error in entertaining Appellees' statutory standing challenge as a 12(b)(1) Article III challenge, however, Appellants failed to object in the District Court or in their briefs on appeal, and, at oral argument, asserted that the District Court acted properly, Oral Arg. Tr. 17-19. Accordingly, we deem any such challenge waived and address the statutory standing question on the merits.

13

upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact," *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 783 (3d Cir. 1995) (hereinafter "*In re GM Corp.*") (quoting *Int'l Union, UAW v. Mack Trucks, Inc.*, 820 F.2d 91, 95 (3d Cir. 1987)).[10]

---

[10] While we have said that denials of motions to intervene as of right and by permission under Rule 24 for untimeliness are both reviewed for abuse of discretion, *Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc.*, 72 F.3d 361, 369 (3d Cir. 1995) (reciting standard for motions to intervene as of right under Rule 24(a)); *Del. Valley Citizens' Council for Clean Air v. Commonwealth of Pa.*, 674 F.2d 970, 974 (3d Cir. 1982) (same for motions to intervene by permission per Rule 24(b)), we have also noted that our review of denials of motions to intervene as of right under Rule 24(a) generally "is more stringent than the abuse of discretion review accorded to denials of motions for permissive intervention," meaning we will reverse if the district court "has applied an improper legal standard or reached a decision that we are confident is incorrect." *Harris v. Pernsley*, 820 F.2d 592, 597 (3d Cir. 1987) (quoting *United States v. Hooker Chems. & Plastics Corp.*, 749 F.2d 968, 992 (2d Cir. 1984)). We need not delve into how this heightened standard might affect the "abuse of discretion" relevant to the District Court's denial of the intervention motions here because we conclude the District Court abused its discretion even under the more forgiving standard generally applicable to Rule 24(b) motions. *See Brody ex rel. Sugzdinis v. Spang*, 957 F.2d 1108, 1115 (3d Cir. 1992) (recognizing that rulings on Rule 24(b) motions are reviewed more deferentially).

## III.    Tauro's Standing

Tauro's statutory standing to serve as a named representative of the putative class of direct purchasers of the OEMs' Class 8 trucks hinges on the validity of R&R's assignment of such direct purchaser claims to Tauro, and in particular whether the assignment of a federal antitrust claim requires consideration.  To answer that question, we must ascertain the federal common law principles that govern such assignments and then apply those principles to the case at hand.[11]

---

[11] We acknowledge that the term and concept of "federal common law" may strike some as anathema to federal court jurisprudence in the wake of *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), but in some areas of the law, marked by pressing interests of the United States or by broad congressional statutes empowering federal courts to make governing rules of law, so-called "federal common law" still exists to provide direction, *e.g.*, *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641-44 (1981).  Federal antitrust law historically has been one such area.  *See, e.g.*, *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 688 (1978).  *But cf. Tex. Indus., Inc.*, 451 U.S. at 641-45 (indicating that while federal common law applies to some components of antitrust law, it does not apply to remedial provisions that Congress described with particularity).  Here, we put aside the doctrinal debates that could be had because we are bound by our precedent, which identifies federal common law as the governing principle for assessing the validity of an assignment of a federal antitrust claim. *Gulfstream III Assocs. v. Gulfstream Aerospace Corp.*, 995

15

## A. Guiding Principles

By imposing the "direct purchaser" rule on antitrust claims and providing that only entities that purchase goods directly from alleged antitrust violators have statutory standing to bring a lawsuit for damages, the Supreme Court sought to avoid the complications that would flow from allowing suits by indirect purchasers. *See generally Ill. Brick Co. v. Illinois*, 431 U.S. 720 (1977). The Court observed that such indirect purchaser suits would force courts to ascertain how much of the supracompetitive prices charged by the violator were passed from the direct purchaser to indirect purchasers down the market chain, and concluded that "the antitrust laws will be more effectively enforced by concentrating the full recovery for the overcharge in the direct purchasers rather than by allowing every plaintiff potentially affected by the overcharge to sue only for the amount it could show was absorbed by it." *Id.* at 735.

In reaching this conclusion, the Supreme Court elucidated three policy rationales, each of which is relevant to our assessment of whether the assignment of an antitrust claim necessitates bargained-for consideration. Specifically, the Court expressed concern regarding: (1) the difficulty courts (and litigants) would have in parsing how much of the harm caused by supracompetitive prices charged by an antitrust violator was incurred by the direct purchaser as opposed to being passed down to indirect purchasers, *id.* at 731-32, 741-44; (2) the possibility that multiple lawsuits could result in inconsistent adjudications of liability or could

F.2d 425, 437 (3d Cir. 1993) (Greenberg, J., concurring and speaking for the majority).

result in an antitrust violator paying more than the injury it actually inflicted once both direct and indirect purchasers obtained recovery, *id.* at 730-31; and (3) the deleterious effect that the combination of uncertainty around damages and the likelihood that each individual indirect purchaser's share of damages would be small would have on the incentive for private parties to initiate suits, *id.* at 745-47. We succinctly distilled these rationales in *Gulfstream III Assocs. v. Gulfstream Aerospace Corp.*, explaining that *Illinois Brick*'s direct purchaser rule seeks to counteract "the difficulty of analyzing pricing decisions, the risk of multiple liability for defendants, and the weakening of private antitrust enforcement that might result from splitting damages for overcharges among direct and indirect purchasers." 995 F.2d 425, 439 (3d Cir. 1993) (Greenberg, J., concurring and speaking for the majority).

Of particular relevance to this case, an indirect purchaser may step into the shoes of a direct purchaser and bring an antitrust suit in that capacity if it receives a valid assignment of a direct purchaser's antitrust claims. *Gulfstream*, 995 F.2d at 437-40; *In re Fine Paper Litig. State of Wash.*, 632 F.2d 1081, 1090 (3d Cir. 1980). We have long required that such assignments be express, *Gulfstream*, 995 F.2d at 437-39, explaining that, consistent with the rationales from *Illinois Brick*, that requirement ensures that only one party has the authority to bring suit, that the damages calculations remain relatively straightforward, and that we do not divvy up damages to the point of reducing the incentive to bring private antitrust suits in the first place, *Gulfstream*, 995 F.2d at 439-40.

At issue in this case, however, is not whether the assignment was express. Rather, we are asked to determine

17

whether an assignment of a federal antitrust claim must also reflect consideration to be valid. *Gulfstream* makes clear that, in answering that question, we must apply federal common law, as opposed to the law of the state, for two reasons: first, to ensure the rules governing assignments of federal antitrust claims accord with the "overall purposes of the antitrust statutes," and second, to avoid a patchwork of "differing state law standards, because such assignments may implicate the 'direct purchaser' rule." *Id.* at 438. But neither the Supreme Court nor our Court has defined the federal common law governing consideration for the assignment of federal antitrust claims. Thus, we must do so before we can apply it to the assignment at issue in this case—an undertaking that requires us first to ascertain the appropriate sources of authority for federal common law in this context.

## B. Source of Federal Common Law

Given that different authorities point to different outcomes, it is not surprising that the parties are at loggerheads over which we should consider. Appellees suggest that we ignore federal common law and simply apply the law of the state in which the assignment was made, or, in the alternative, that federal common law requires us to conduct what amounts to a fifty-state survey of the rules governing assignments in each state and then apply the most common rule. In contrast, Appellants urge that we apply the Second Restatement of Contracts, which they contend does not require consideration for a valid assignment.

We can dispense with Appellees' proposed alternatives in short order: one contravenes our case law and the other is unworkable. Appellees' proposal that we apply the law of the state in which the assignment was made is one we have

18

expressly rejected in the past for reasons that are just as sound today. As we observed in *Gulfstream*, "assignments of antitrust claims cannot appropriately be left to determination under possibly differing state law standards." 995 F.2d at 438. There, we declined to apply state law, explaining that because "federal common law governs the assignment of an antitrust cause of action, there is no issue as to what state's law would apply." *Id.* at 437 n.1.

We likewise reject Appellees' fifty-state survey approach as inefficient, unreliable, and subject to manipulation. In practice, it would have litigants and courts reinvent the wheel for every contract-related question arising under federal common law by conducting nationwide surveys and attempting to characterize the vagaries of state law in existence at any given time. The inconsistent results would not only generate uncertainty for would-be assignors and consternation for courts attempting to apply precedent, but also would run contrary to the twin rationales we identified in *Gulfstream* for applying federal common law to antitrust claim assignments in the first place—ensuring the law accords with the "overall purposes of the antitrust statutes" and avoiding a patchwork of standards. *Id.* at 438.[12]

---

[12] Appellees' reliance on *In re Columbia Gas Systems Inc.*, 997 F.3d 1039, 1055 (3d Cir. 1993), for the proposition that we hew closely to state law so as to protect litigants' "commercial expectations" reflects, at best, a misreading of that case. The discussion Appellees cite was our recitation of the Supreme Court's test for ascertaining when to apply federal common law in the first instance, *id.* (citing *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 727-78 (1979)), not a test for how to fashion federal common law thereafter.

Indeed, this appeal is illustrative of the shortcomings of this approach, with both sides having submitted lengthy and dueling appendices that purport to catalogue the applicable rule for each state with contradictory results. Moreover, while the parties and their able counsel here had the resources to undertake this laborious task, for some assignees, such a project may prove a disincentive to bringing suit—one of the very hazards the Supreme Court sought to avoid in adopting the direct purchaser rule. *Ill. Brick*, 431 U.S. at 745-47.

In contrast, Appellants' proposal that we look to the Restatement of Contracts as a starting point for fashioning rules of federal common law finds support in our case law and the twin aims of *Gulfstream*. As the American Law Institute explained when it first launched the Restatement of Contracts in 1932, "the Restatement of this and other subjects" was designed to serve "as prima facie a correct statement of what may be termed the general common law of the United States," notwithstanding "instances in which the law in one or more States may vary from the law stated in a particular section." Restatement (First) of Contracts, Introduction (Am. Law Inst. 1932). And in the decades since, that aspiration has been realized with the Restatement functioning not only as an authoritative fifty-state survey of contract law, offering a consistent point of reference to parties and courts, but also as a proposed "correct statement,"

---

Here, *Gulfstream* already dictates that we apply federal common law, rendering the considerations in *Columbia Gas Systems* inapposite.

reflecting a synthesis and analysis of that law and the consensus of the states.[13]

For those reasons, we have looked to the Restatement in the past when applying the federal common law of contracts generally, and the law of antitrust assignments specifically. In *Livingstone v. North Belle Vernon Borough*, 91 F.3d 515, 525-26 & n.11 (3d Cir. 1996), for example, we applied the federal common law of contracts in a suit brought under 42 U.S.C. § 1983 and cited to the Restatement (Second)

---

[13] Indeed, the very cases upon which Appellees rely to advance their fifty-state survey approach cut in favor of applying the Restatement. As Appellees note, in *Smith Land & Improvement Corp. v. Celotex Corp.*, 851 F.2d 86, 92 (3d Cir. 1988), we observed that "[t]he general doctrine of successor liability in operation in most states should guide the" district court in defining the federal common law relevant to that case on remand. While we left it to the district court to make that determination in the first instance, we did discuss the general precepts of successor liability and, in doing so, referenced only treatises on corporate law, *id.* at 91, close cousins of the Restatement. Moreover, while Appellees cite to a recent Fifth Circuit case in which the court described its application of the federal common law of contracts as adhering to "the core principles of the common law of contracts that are in force in most states," *Excel Willowbrook, L.L.C. v. JP Morgan Chase Bank, Nat'l Ass'n*, 758 F.3d 592, 597 (5th Cir. 2014) (quoting *Smith v. United States*, 328 F.3d 760, 767 (5th Cir. 2003)), the court went on to identify those very principles by citing directly to the Restatement of Contracts, *id.* at 597 n.8.

21

of Contracts for the proposition that the duty of good faith and fair dealing exists at federal common law. And in *In re Fine Paper Litigation*, we concluded that the Restatement of Contracts was "in accord" with the "general law" applicable to assessing the effect of one party's assignment of its antitrust claims to another. 632 F.2d at 1091.[14]

Using the Restatement as a guidepost to define federal common law concerning the validity of assignments of antitrust claims also comports with one of the twin aims of *Gulfstream*: promoting national uniformity. 995 F.2d at 438. The Restatement eliminates the risk of courts reaching inconsistent conclusions about the consensus of state law, supplants the need for a would-be assignor or assignee to conduct her own fifty-state survey before assigning an antitrust claim to ensure it will be enforceable in federal court, and sets a baseline from which litigants may operate when challenging or defending the validity of such an assignment. This state of affairs is exactly what *Gulfstream* envisioned a federal rule would provide.

---

[14] Rather than consider the Restatement or the proper source of federal common law, the District Court noted that *In re Fine Paper Litigation* itself cited to a district court case called *Mercu-Ray Industries, Inc. v. Bristol-Myers Co.*, 392 F. Supp. 16, 18 (S.D.N.Y.), *aff'd*, 508 F.2d 873 (2d Cir. 1974), which posited that consideration may be relevant to the assignment of an antitrust claim; upon inspection, however, the district court in that case merely noted that issues such as the giving of consideration were not even challenged in that case. In other words, *Mercu-Ray Industries* sheds no light on the federal common law of contracts.

22

In sum, we agree with Appellants that the Restatement carries persuasive force in defining our federal common law, but we also caution that it serves only as a starting point. *Gulfstream* instructs not only that we avoid a patchwork of state standards, but also that we craft federal common law that pursues the "overall purposes of the antitrust statutes." *Id.* For that reason, before adopting the Restatement's approach to a given legal question as federal common law, we must confirm that the proposed rule comports with the underlying purpose and goals of federal antitrust law as outlined in *Illinois Brick*.[15] We thus turn to the Restatement and the policy rationales undergirding the direct purchaser rule to determine whether bargained-for consideration is required for an assignment of an antitrust claim to have legal effect.

## C. Defining Federal Common Law

We begin with the Restatement. Consistent with *Gulfstream*'s requirement that an "intention" to assign a federal antitrust claim be manifested expressly, 995 F.3d at 438-39, the Restatement states: "It is essential to an assignment of a right that the obligee manifest an intention to transfer the right to another person . . . ." Restatement (Second) of Contracts § 324 (Am. Law Inst. 1981). And in discussing "Assignments and Delegation," the Second

---

[15] We also recognize that the Restatement may lose some of its persuasive force if it can be demonstrated that there has been a fundamental shift in the status of the law on a given topic in the years since the Second Restatement's publication in 1981. We have not detected any such tectonic shift in the law of assignments at issue in this case.

23

Restatement expressly addresses gratuitous assignments—that is, assignments given without consideration.[16] Restatement (Second) of Contracts § 332. Specifically, it provides: "Unless a contrary intention is manifested, a gratuitous assignment is irrevocable if . . . the assignment is in writing." *Id.* In other words, so long as an assignment is written and express, it is valid under the Restatement, even absent consideration.

Appellees object that the Second Restatement's discussion of assignments is "limited to rights, duties, and conditions arising under a contract or for breach of a contract" such as "debts, rights to non-monetary performance and rights to damages and other contractual remedies," and does not extend to what were historically known as "choses in action," which include "debts of all kinds, tort claims, and rights to recover ownership or possession of real or personal property"—i.e., non-contractual causes of action. Restatement (Second) of Contracts § 316 & cmt. a ("The

---

[16] Appellees' strained argument that "gratuitous" and "without consideration" are inherently different is foreclosed by the Restatement's description of a gratuitous assignment, Restatement (Second) of Contracts § 332 (defining a gratuitous assignment as any assignment "unless it is given or taken . . . in exchange for a performance or return promise that would be consideration for a promise"), and by the definition of "gratuitous" in Black's Law Dictionary, Black's Law Dictionary 143, 816 (10th ed. 2009) (defining "gratuitous" as "given without consideration in circumstances that do not otherwise impose a duty" and "gratuitous assignment" as "[a]n assignment not given for value").

rules stated here may have some application to non-contractual choses in action, but the transfer of non-contractual rights is beyond the scope of the Restatement of this Subject.").

The Restatement itself, however, makes clear that this limitation is based on an antiquated distinction between contractual rights and choses in action that no longer has a significant effect on the common law. In § 317, which defines "what can be assigned or delegated," the Restatement explains that "the historical common-law rule that a chose in action could not be assigned has largely disappeared." *Id.* § 317 cmt. c; *accord id.* Chapter 15 Introductory Note ("The historic rule in the common-rule courts of England was that a 'chose in action' could not be assigned. The scope of that rule was progressively narrowed . . . . Little remains of it today."). Moreover, while not citing the Restatement for this purpose, we similarly noted in *In re Fine Paper Litigation*, which dealt with the assignment of an antitrust claim, that "[a]lthough the common law did not favor the assignment of causes of action, by and large that attitude has been overcome." 632 F.2d at 1090. Thus, what Appellees attempt to erect as a historical and definitional roadblock, we resolve with a short detour, concluding that the Second Restatement remains the most persuasive authority for assessing whether assignment of an antitrust claim requires consideration.

Having concluded that it does not, we proceed to consider whether such a rule comports with the underlying purposes of antitrust law generally and the doctrine of direct purchaser standing specifically. *See Gulfstream*, 995 F.2d at 438. *Illinois Brick* directs us to prioritize three goals with regard to direct purchaser standing: avoiding duplicitous litigation, streamlining damages calculations, and preventing

25

disincentives for private antitrust suits. 431 U.S. at 730-32, 745-47. While our requirement that assignments of federal antitrust claims be express advances these goals, *see Gulfstream*, 995 F.2d at 440, requiring consideration does not. As such, adopting the Restatement rule as our federal common law rule in this context is in line with the "overall purposes of the antitrust statutes." *Id.* at 438.

Conversely, requiring consideration for the assignment of a federal antitrust claim could discourage private enforcement of the antitrust laws in derogation of *Illinois Brick*. Part of creating incentives for private antitrust suits is making federal courts a welcome forum for such litigation, and erecting the barrier of consideration threatens to shut out otherwise meritorious suits from resolution. True, in some circumstances, consideration could spur such private suits because an assignee who pays valuable consideration for the right to sue might be more likely to actually bring suit in order to recoup its investment. But in situations like the one at issue in this case, if a direct purchaser is uninterested in pursuing its claims, whether because it deems them valueless or because it cannot afford the expense of litigation, an otherwise willing and interested assignee might be discouraged from pursuing the suit in the direct purchaser's stead if it were required to provide consideration. Here, for example, the record reflects that R&R assigned its antitrust claim to Tauro in part because it believed—in error—that because it had sold its trucks to Tauro, it no longer had any claim itself. Had R&R not assigned its claim, it is far from clear that it ever would have pursued its direct purchaser claims. In short, because requiring consideration could hinder the private enforcement of antitrust laws, that rule would not accord with the goals *Illinois Brick*.

Appellees counter that our requirement in *Gulfstream* that assignments be express was intended to "create[] an *additional* obstacle for assigning direct-purchaser antitrust claims," and, as a result, it would "flout the antitrust policy considerations animating *Gulfstream*'s holding" to allow assignments to proceed absent consideration by "mak[ing] it *easier* for a direct purchaser to assign its claims." Appellees' Br. 20. *Gulfstream*, however, is not such a blunt tool. We imposed the "express assignment" requirement in that case not to signal that courts should erect as many hurdles to assigning antitrust claims as possible, but rather in an effort to bring our case law in line with the rationales underlying *Illinois Brick*. *See* 995 F.2d at 438-40. Specifically, we reasoned that an effective assignment must directly reference antitrust claims in order to ensure that any transfer of direct purchaser status is crystal clear, thereby "eliminat[ing] any problems of split recoveries or duplicative liability." *Id.* at 440. While requiring an express assignment therefore advances the Supreme Court's goal to prevent duplicative liability (and, in so doing, advances another *Illinois Brick* goal: streamlining damages calculations), we are not persuaded that requiring the parties to an assignment to exchange consideration has the same effect.

On the contrary, while Appellees point out the possibility of duplicitous liability in federal and state courts if federal common law does not require consideration yet state law does, their proposed requirement of consideration only gives rise to the mirror image of that same problem—i.e., an assignment given with consideration in a state that does *not* require consideration would empower an assignee to bring a state antitrust claim and an assignor to bring any federal claims. Our disposition today thus does not eliminate the

27

possibility that an assignment in some instances will be valid for federal but not for state claims, but that is a necessary consequence of our federalist system of government, and the resolution we adopt better comports with the goals of federal antitrust law. Our task, after all, is to create a federal rule applicable regardless of the assignment's state of origin. If we are constrained to rules that in no way impact or depart from state law, then federal common law would simply track state law—an outcome foreclosed by *Gulfstream*'s exhortation to national uniformity.

In sum, we conclude that consideration has little role to play in advancing the goals of *Illinois Brick* and requiring it could affirmatively undermine one of them by, in certain circumstances, discouraging private enforcement of the federal antitrust laws. We therefore hold, consistent with the Second Restatement of Contracts, that consideration is not required under federal common law to give effect to an otherwise express assignment.

## D. Applying Federal Common Law

All that remains as to this issue is the simple matter of applying the federal common law we announce today to the facts of this case. Here, there is no dispute that R&R's assignment of its antitrust claims to Tauro was both written and express, meaning that it is valid with or without consideration.[17] Consequently, the District Court erred in

---

[17] The relevant portion of the written assignment at issue in this case reads:

> R&R hereby conveys, assigns and transfers to Tauro all rights, title and interest in and to all

28

concluding the absence of consideration invalidated the assignment upon which Tauros' standing was predicated. Accordingly, we will reverse its dismissal of Tauro for lack of standing and its denial of the motion for class certification for lack of a named class representative.

## IV.    Timeliness of Proposed Intervenor's Motions to Intervene

We now shift gears to consider the second issue on appeal: Toledo Mack and JJRS's motions to intervene. With the specter of the putative class losing its named representatives, direct purchasers Toledo Mack and JJRS filed motions to intervene as representatives of the putative class both as a matter of right and permissively, pursuant to Federal Rules of Civil Procedure 24(a)(2) and 24(b), respectively. The District Court denied these motions as untimely, concluding that, despite the motions having been filed only two months after Appellees first asked the District Court to dismiss Tauro for lack of standing, interrogatories and depositions posed to Tauro months earlier should have put Toledo Mack and JJRS on notice of the potential for

> *causes of action* it may have against Defendants, *under the antitrust laws* of the United States or of any State, arising out of or relating to R&R's purchases . . . of vehicles containing Class 8 transmissions which were subsequently resold to Tauro. This assignment includes *R&R's status as a direct purchaser* of all vehicles containing Class 8 transmissions . . . .

J.A. 137 (emphasis added).

29

dismissal of the class certification motion and triggered intervention motions at that time. We agree with Toledo Mack and JJRS that the District Court's denial of their motions to intervene was an abuse of discretion.

A district court's timeliness inquiry for both types of Rule 24 motions requires considering the totality of the circumstances arising from three factors: "(1) the stage of the proceeding; (2) the prejudice that delay may cause the parties; and (3) the reason for the delay." *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 314 (3d Cir. 2005); *In re Fine Paper Antitrust Litig.*, 695 F.2d 494, 500 (3d Cir. 1982) (treating the timeliness inquiry the same for both types of Rule 24 motions). These three factors are necessarily bound up in one another, *see, e.g.*, *Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc.*, 72 F.3d 361, 370 (3d Cir. 1995) ("[T]he stage of the proceeding is inherently tied to the question of the prejudice the delay in intervention may cause to the parties already involved."), and we maintain "a general reluctance to dispose of a motion to intervene as of right on untimeliness grounds because the would-be intervenor actually may be seriously harmed if not allowed to intervene," *Benjamin ex rel. Yock v. Dep't of Pub. Welfare of Pa.*, 701 F.3d 938, 949 (3d Cir. 2012).

We also have recognized a presumption of timeliness for intervention motions filed by purported class members— at least where the class has been certified and before the court-appointed opt-out deadline has passed, *In re Cmty. Bank*, 418 F.3d at 314, although we have not had occasion before today to opine whether that presumption applies pre-certification as well. The presumption, in any event, is not dispositive, and may be rebutted by a contrary determination

30

under the totality of the factors described above. *See In re Cmty. Bank of N. Va.*, 622 F.3d 275, 312-13 (3d Cir. 2010).

Appellants make two arguments as to why the District Court abused its discretion in finding their motions untimely. First, they urge that the District Court should have applied the presumption of timeliness in this case, even though the putative class had not yet been certified. Second, they argue that the District Court erred in its application of the three timeliness factors, and had it properly applied them in the context of the presumption, it could not have discarded their motions as untimely. We are in agreement.[18]

---

[18] Our jurisprudence requires a district court to consider four factors when ruling on a Rule 24(a)(2) motion: whether "(1) the application for intervention is timely; (2) the applicant has a sufficient interest in the litigation; (3) the interest may be affected or impaired, as a practical matter by the disposition of the action; and (4) the interest is not adequately represented by an existing party in the litigation." *Harris*, 820 F.2d at 596. Because Appellees did not dispute the latter three factors, the District Court disposed of both the intervenors' motions solely on the timeliness factor. *Wallach*, 125 F. Supp. 3d at 495. Timeliness is thus the only issue presented to us on appeal. Although it may be that Toledo Mack and JJRS opt to withdraw their motions to intervene in view of Tauro's standing to proceed as a class representative, should they choose to persist in their motions and dispute the remaining factors on remand, nothing in our opinion should be taken to suggest that the District Court may not take these factors into account in ruling on the Rule 24 motions.

### A. Procedural History

We recount the procedural history of this case in some detail only because it is necessary for our review of the District Court's denial of the motions to intervene. After it commenced and Tauro became a named representative in 2010, this case wound its way through several years of litigation, resulting in over 2.5 million pages of discovery.

In August 2014, Appellees served interrogatories on Tauro that asked, among many other things, about the nature of the assignment of R&R's direct purchaser claim, and in November 2014, Appellees conducted related depositions. The goal of the assignment-related questions was to ascertain whether Tauro and R&R exchanged bargained-for consideration for the assignment in 2010. Appellees urge that these interrogatories and depositions put Tauro on notice that its standing in the case—predicated on a valid assignment of R&R's claim—was in jeopardy. Also in November 2014, Appellants filed a Rule 23 motion for class certification, and the District Court scheduled evidentiary hearings for the following March.

In early January 2015, Appellees submitted a letter to the District Court seeking leave to file a motion to dismiss the case for lack of standing under Federal Rule of Civil Procedure 12(b)(1) based on their conclusion that R&R's assignment of its antitrust claims was ineffective for lack of consideration. The District Court denied that request two weeks later, and instructed Appellees to present their standing arguments in their response brief to Appellants' motion for class certification. Appellees submitted that response brief two days later, which addressed both their standing and class certification arguments.

On March 6, 2015, Tauro filed its reply brief to Appellees' brief on class certification and standing, which also redefined the class to drop PTS from the case. On the same day, concerned at this point that Tauro could be ousted and leave the suit without any named representative, Tauro's attorney filed a Rule 24 motion on behalf of Toledo Mack, seeking to intervene as a putative class representative. On March 24, 2015, the same attorney filed an analogous motion on JJRS's behalf, and the District Court held a hearing on all of the relevant motions the following day. By this point, discovery had closed, and the deadline for joinder had passed over a year earlier. The District Court thereafter denied the motions to intervene as untimely. *Wallach*, 125 F. Supp. 3d at 496.

## B. Presumption of Timeliness

Appellants protest that the District Court erred in concluding that the presumption of timeliness announced in *In re Community Bank* does not apply to would-be intervenors where a class has yet to be certified and notice containing an opt-out date has yet to be mailed to the putative class members.[19] *See Wallach*, 125 F. Supp. 3d at 495 n.9. While it is true that we fashioned this rebuttable presumption

---

[19] While we review the District Court's denial of the motions to intervene for abuse of discretion, "[w]hether an incorrect legal standard has been used is an issue of law to be reviewed *de novo*." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 312 (3d Cir. 2008) (quoting *In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 32 (2d Cir. 2006)). Whether the presumption applies pre-certification is just such an issue.

in *In re Community Bank* for a class action at a different stage than the one before us, we agree with Appellants that the rationale that animated the presumption in *In re Community Bank* applies with equal force in the pre-certification context.

That rationale was that members of a class have no "duty to take note of the suit or to exercise any responsibility with respect to it" until "the existence and limits of the class have been established and notice of membership has been sent." 418 F.3d at 314 (quoting *McKowan Lowe & Co. v. Jasmine, Ltd.*, 295 F.3d 380, 384 (3d Cir. 2002)). Those concerns for fair notice and the rights of persons who may otherwise be bound by the judgment in a class action carry just as much weight for putative class members before a court has ruled on class certification. We thus decline to adopt the District Court's bright-line rule distinguishing between pre- and post-certification motions to intervene.[20]

---

[20] The District Court grounded its distinction between a putative and a certified class on a 1975 Supreme Court case in which the Court noted that "[w]hen [a] District Court certifie[s] the propriety of [a] class action, the class of unnamed persons described in the certification acquire[s] a legal status separate from the interest asserted by the appellant." *Sosna v. Iowa*, 419 U.S. 393, 399 (1975). The Court in *Sosna*, however, was addressing whether a class action challenging certain Iowa residency requirements for divorce was moot once the named plaintiff had satisfied the residency requirement over the course of the litigation. Its pronouncements in the context of mootness did not address the interests that give rise to the presumption of timeliness we recognized in *In re Community Bank* and do not suggest that the interests of putative class members seeking to intervene

34

In addition to relying on *In re Community Bank* itself, Appellants contend that *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), supports their position on the presumption of timeliness. *American Pipe* established the rule that statutes of limitations toll while class certification motions are pending so that putative class members may await resolution of such motions and retain their ability to intervene in the event such motions for class certification are denied after the limitations period would have run on their individual claims. *See Am. Pipe & Constr. Co.*, 414 U.S. at 545-53. In crafting this rule, the Supreme Court sought to relieve putative class members of the need "to file earlier individual motions to join or intervene as parties," because such "multiplicity of activity" would run contrary to two key goals of the class action device: efficiency and judicial economy. *Id.* at 551.

While they do not directly cite *American Pipe* in their brief, Appellees invoke its reasoning by forewarning that extending the presumption to the pre-certification context would expose courts to endless intervention motions, clogging the courts with the very "multiplicity of activity" *American Pipe* sought to avoid. Their point is well taken, and we cautioned in *In re Community Bank* that the presumption of timeliness should not be read to authorize a flurry of intervention or joinder motions unrelated to the merits of the class action because such a result would "seriously hamper[]" the "goals of Rule 23" as outlined in *American Pipe*. 418 F.3d at 315.

---

are so different from those of members of a certified class as to justify altering the presumption's application.

35

That word of warning, however, did not preclude our invocation of the presumption in *In re Community Bank*. And, as Appellants point out, without the presumption of timeliness, "class members would be compelled to intervene in *every* class action to protect their interests in the event the proposed class representatives are ultimately deemed inadequate"—giving rise to inefficiencies "[t]he class action device was designed to avoid . . . both before and after class certification." Reply Br. 16. Denying the presumption to putative class members also could result in great inefficiencies and reductions in judicial economy in cases like the one before us, which would be dismissed after years of motion practice and discovery, only to be filed anew by plaintiffs who were unable to simply intervene and carry the motion for class certification through to its conclusion. Further, if the presumption of timeliness applied only to certified classes, then motions to intervene brought prior to class certification might be deemed untimely, even though those same motions would be timely if brought years later, after a class was certified. The illogic of such result and the goals of efficiency and judicial economy emphasized by the Supreme Court in *American Pipe* militate that we extend the presumption of timeliness from *In re Community Bank* to the pre-certification context.

Not having had the benefit of our holding today, the District Court understandably failed to apply that presumption to Toledo Mack and JJRS's motions to intervene. As it turns out, however, that omission amounted to a misapplication of the law, which necessarily constitutes an abuse of discretion. *In re GM Corp.*, 55 F.3d at 783. Under these circumstances, we could remand for the District Court to apply the presumption in the first instance and determine whether it was

36

rebutted by the totality of the timeliness factors. *See, e.g.*, *In re Cmty. Bank*, 622 F.3d at 312-13. However, where, as here, the totality of those factors points only to one conclusion—that the presumption is not rebutted and the District Court erred in concluding two of the three factors weighed against timeliness—we may proceed to address those factors here. *See, e.g.*, *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 712 (3d Cir. 2004) ("Although a district court's application of an incorrect legal standard 'would normally result in a remand, we need not remand' if application of the correct standard could support only one conclusion." (quoting *Duraco Prods., Inc. v. Joy Plastic Enters., Ltd.*, 40 F.3d 1431, 1451 (3d Cir. 1994))). For the sake of efficiency, we will proceed with that analysis here.

## C. The Timeliness Factors

The District Court concluded that all three of the timeliness factors weigh against Toledo Mack and JJRS's motions to intervene. *Wallach*, 125 F. Supp. 3d at 495-96. In light of the presumption of timeliness, which necessarily raises the bar for a motion to intervene to be deemed untimely, and our conclusion that two of the three timeliness factors point strongly in favor of granting the motions, we will reverse the District Court's denial of those motions.

As a threshold matter, we agree with the District Court that the first timeliness factor—the stage of the litigation—counsels in favor of denial. While this factor requires us to assess "what proceedings of substance on the merits have occurred," rather than considering "[t]he mere passage of time," *Mountain Top Condo. Ass'n*, 72 F.3d at 369, we are satisfied that the proceedings here were advanced. Unlike in *Mountain Top Condominium Ass'n*, where there had been "no

37

depositions taken, dispositive motions filed, or decrees entered during the four year period in question," *id.* at 370, the litigants here had briefed (and resolved) a dispositive motion to dismiss, undertaken "extensive fact discovery," briefed the motion to certify the class, and submitted expert reports and depositions before the motions to intervene were filed, *see Wallach*, 125 F. Supp. 3d at 495. While Appellants pose some arguments to the contrary,[21] we agree with the District Court that, on balance, the extensive briefing and years-long discovery already completed by the time the motions to intervene were filed rendered the suit sufficiently advanced to weigh against granting said motions.

However, the other two timeliness factors—reason for delay and prejudice to the parties—point decisively in the opposite direction, leading to the inexorable conclusion that the totality of the circumstances supported granting the motions to intervene.[22] In assessing whether there was a legitimate reason for the proposed intervenors' purported

---

[21] For example, Appellants point out that discovery was ongoing in some respects, summary judgment had not yet been briefed, the parties were a year away from trial, and that they would not request additional discovery; at most, they argue, "intervention would have required [Appellees] to produce documents and possibly sit for two depositions." Appellants' Br. 26-27.

[22] Although a different sequence than that we provided in *In re Community Bank*, 418 F.3d at 314, we opt here to address the reason for delay factor before the prejudice factor because our conclusions as to the former inform the latter.

delay in filing their motions, we consider the extent of the delay and whether there was good reason for it.

Our standard to measure any purported delay is clear: "To the extent the length of time an applicant waits before applying for intervention is a factor in determining timeliness, it should be measured from the point at which the applicant knew, or should have known, of the risk to its rights." *United States v. Alcan Aluminum, Inc.*, 25 F.3d 1174, 1183 (3d Cir. 1994); *accord Benjamin*, 701 F.3d at 950 ("The delay should be measured from the time the proposed intervenor knows or should have known of the alleged risks to his or her rights or *the purported representative's shortcomings*." (emphasis added)). Less clear, and the subject of vigorous dispute between the parties, is when this point occurred.

Appellees insist that Toledo Mack and JJRS knew or should have known Tauro's direct purchaser standing was at risk as of the August 2014 interrogatories that inquired whether R&R's assignment was supported by valid consideration or the November 2014 depositions related to such interrogatories. The District Court agreed, concluding that the August interrogatories and November depositions were the proper "yardstick" from which the assess timeliness because the "caliber of representation and the significant amount of discovery" meant that the proposed intervenors "should have become aware of potential challenges to the standing of the named class representatives" at that time. *Wallach*, 125 F. Supp. 3d at 495-96. Appellees' argument relies heavily on the fact that Toledo Mack and JJRS were represented by the same counsel as Tauro, implying that counsel's knowledge of the interrogatories should be imputed to Toledo Mack and JJRS. Appellees further contend that

39

even if January 2015 is the proper benchmark, two months was an unreasonable delay.

Appellants, on the other hand, contend that the letter that Appellees submitted to the District Court in January 2015, seeking leave to file a 12(b)(1) motion to dismiss for lack of standing, is the moment they were first made aware of the possibility that Tauro would be dropped from the suit, and they aver they were confident in the validity of the assignment until that time. From that vantage point, they argue, the delay of two months until Toledo Mack's March 6 motion to intervene—filed on the *same day* Tauro itself filed its reply brief to Appellees' standing challenge—and two-plus months for JJRS's March 24 motion were not meaningful delays.

We agree with Appellants that the interrogatories and depositions, directed as they were at Tauro, should not be viewed as having put Toledo Mack and JJRS—or the counsel they shared with Tauro—on notice of the need to intervene as class representatives, and thus August and November 2014 did not start the running of the hourglass. Moreover, even accepting Appellees' theory of imputed knowledge, the interrogatories at issue were phrased in general terms, and only two of the twenty-nine questions posed to Appellants in August 2014 were related to the validity of R&R's assignment; similarly, only a small fraction of the November depositions raised questions about whether consideration was exchanged. It cannot be said that general questions about the assignment should have triggered concerns about Tauro's standing sufficient to induce counsel to find alternative plaintiffs, particularly where Appellees had not challenged the validity of the assignment over the course of the preceding *five* years, including in their 2010 motion to

dismiss the suit. *Cf. Mountain Top Condo. Ass'n*, 72 F.2d at 370 (affirming grant of motion to intervene in part where plaintiffs alleged they had "*reasonably concluded*" their money was safe for a long time and took prompt action once they were informed otherwise, even though it was late in the grand scheme of the lawsuit (emphasis added)). At base, timeliness cannot hinge on requiring litigants and their attorneys to divine the intent behind each of their opponent's questions in discovery and defensively file motions based on conceivable uses their answers might provide. [23] We

---

[23] Appellants make two additional observations, upon which we need not rely. First, they urge that the interrogatories and depositions were not public documents, meaning Toledo Mack and JJRS had no way of being put on notice regarding their contents (and the concomitant risk to the class action) and further supporting a later date as the proper benchmark. While lack of access to these documents would be a legitimate additional reason to reject the interrogatories and depositions as the relevant moment in time, we need not and do not rely on this fact, which was not made plain in the record. Second, for the first time in their reply brief on appeal, Appellants assert that Toledo Mack and JJRS did not retain class counsel until *after* Appellees filed their response to Appellants' motion for class certification in late January 2015 (which included Appellees' challenge to Tauro's standing), implying that the proposed intervenors were ignorant of any risk to the litigation until that time. Appellees retort that Toledo Mack and JJRS fail to explain whether they had previous contact with Tauro's counsel before retaining him for the intervention motions that would have put them on notice of the risk to Tauro's standing and that counsel's knowledge of the potential risks to Tauro's

41

conclude, therefore, that the earliest moment at which Toledo Mack and JJRS were on notice of the serious risk that the named representative might lack standing was the submission of Appellees' January 2015 letter advising of their intent to challenge the validity of R&R's assignment.

Appellees rely on *NAACP v. New York*, 413 U.S. 345, 366-67 (1973), to argue that the two months that elapsed between the January letter and Toledo Mack's motion to intervene nonetheless amounted to an unreasonable delay. We disagree. While the Court there did affirm a denial of a motion to intervene filed three weeks after the intervenors claimed to have become aware of the issue in that case, its rationale was tied more to the stage of the litigation factor, not the reason for delay factor. In addition, the NAACP in that case had strong reason to believe the case was going to imminently come to an end because the United States government—the opposing party—was expected to consent to entry of summary judgment. *See id.* Here, Toledo Mack and JJRS had no reason to suspect Tauro would capitulate to the challenge to its standing, and it was therefore reasonable for them to file their motions to intervene alongside Tauro's reply.

Moreover, here, the District Court specifically directed Appellees to brief their standing challenge in their response to Appellants' motion for class certification, making it all the more reasonable for the proposed intervenors to seek to intervene in conjunction with Tauro's reply. Given that Tauro, Toledo Mack, and JJRS were all represented by the

standing should be imputed to Toledo Mack and JJRS in any event. We decline to consider these arguments, as they are not based on facts in the record.

same counsel and that the District Court had expressed a clear preference for the issues to be consolidated, intervenors did not unduly delay in filing their motions in coordination with Tauro's reply rather than filing them piecemeal.

The District Court's erroneous assessment of the alleged delay in this case also infected its analysis of prejudice. District Courts are instructed to assess the prejudice that would befall either party that is "attributable to any time delay." *Mountain Top Condo. Ass'n*, 72 F.3d at 370. Having concluded there was no meaningful delay here, we are skeptical of the alleged prejudice to Appellees. The grounds identified by the District Court do not, in any event, withstand scrutiny.

The District Court concluded that "allowing intervention at this stage in the litigation would require re-opening discovery to explore the suitability of the intervening plaintiffs as a class representatives [sic] and re-briefing class certification issues specific to the intervening plaintiffs." *Wallach*, 125 F. Supp. 3d at 496. But Appellants have not sought to re-open discovery or re-brief class certification, and additional discovery Appellees may require would be limited to Toledo Mack and JJRS's standing, typicality, and adequacy as class representatives. The District Court further stated that Appellees "would additionally be required to respond to the proposed complaint. After five years of litigation, these additional hurdles will result in further delays as well as burdensome costs to the defendants." *Wallach*, 125 F. Supp. 3d at 496. But Appellees did not bring their challenge to Tauro's standing until *five years* into the litigation, thereby bringing upon themselves any prejudice stemming from late-arising additional answers and discovery on Toledo Mack and JJRS's adequacy to serve as class

43

representatives. On balance, then, because there was no significant delay from which prejudice could stem and because the nature of the burdens facing Appellees does not amount to significant prejudice, this factor, too, weighs in favor of granting the motions to intervene.

For these reasons, we conclude that the totality of the timeliness factors clearly weighs in favor of granting Toledo Mack and JJRS's motions to intervene and cannot rebut the presumption of timeliness the District Court erroneously failed to afford to those motions. Because the District Court applied the wrong legal standard and misapplied the law to the facts, it abused its discretion in denying them. *See In re GM Corp.*, 55 F.3d at 783.

## V. Conclusion

For the foregoing reasons, we will reverse the District Court's decisions to dismiss Tauro for lack of standing, to deny Toledo Mack and JJRS's motions to intervene as class representatives, and to—as a result—dismiss Appellants' motion for class certification for lack of Article III standing. In light of these reversals, we will remand this case for proceedings consistent with this opinion.